THE COUNTERS FIRM, P.C.

Representation you can count on.

Lisa Counters, 016436
16421 N. Tatum Blvd., Ste. 207
Phoenix, AZ 85032
(602) 490-0030 Voice
(888) 683-8397 Fax
Lisa@countersfirm.com
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| DENISE Richardson | 13-CV-0073-PHX-ROS |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| vs. | |
| LifeLock, INC., a Delaware corporation, and TODD DAVIS, | |
| Defendant/Appellee. | |

### AMENDED COMPLAINT

The Plaintiff, DENISE Richardson ("Richardson") sues the Defendants, LifeLock, INC., ("LifeLock"), and TODD DAVIS, ("DAVIS") (collectively "Defendants") and states as follows:

### Nature Of The Action

1.     This action is brought under the Employee Retirement Income Security Act ("ERISA") and the Fair Labor Standards Act ("FLSA") to obtain and to remedy denial of ERISA retirement and welfare benefits, to provide a remedy for LifeLock and DAVIS's retaliation in response to Richardson's request for benefits under ERISA plans as an employee, and to remedy other ERISA violations committed by LifeLock against

Richardson, an eligible employee of LifeLock and employee of DAVIS, because Richardson has been misclassified as an independent contractor of LifeLock and of DAVIS, and to recover unpaid overtime wages, benefits and liquidated damages for LifeLock's violations of the FLSA.  This action also contains Florida common law claims of fraud, breach of contract and unjust enrichment seeking additional damages including punitive damages for fraud.

## **Jurisdiction And Venue**

2.      This Court has jurisdiction pursuant to ERISA, 29 U.S.C. §§ 1104, 1105, 1132(e)(1), and pursuant to 28 U.S.C. § 1331.

3.      This Court has jurisdiction over the matter pursuant to the parties' contractual agreement and by court order dated April 9, 2013. This Court has personal jurisdiction over LifeLock, a Delaware Corporation with its principal place of business in Maricopa County, Arizona.  This Court has personal jurisdiction over DAVIS, the Chief Executive Officer of LifeLock because Davis is a resident of Maricopa County, Arizona.

4.      This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in this district under ERISA, 29 U.S.C. §1132(e)(2) and 28 U.S.C. § 1391, because the defendant's welfare and benefit plans apply to employees in this district, breaches took place in this district and defendants do business in this district.

**The Parties**

6.     Plaintiff, Richardson, is a citizen and resident of Broward County, Florida. Richardson was an employee of LifeLock from January 1, 2008 through February 2012, although she was misclassified by LifeLock as an independent contractor.  At all relevant times, Richardson was an "employee" of LifeLock within the meaning of 29 U.S.C. § 203(e)(1), and under the applicable Federal and State of Florida common-law definitions.

7.     At all times material, LifeLock was the "employer" of Richardson within the meaning of FLSA, 29 U.S.C. § 203(d) and ERISA, 29 U.S.C. §1002(5).

8.     At all relevant times, Davis was Richardson's employer as defined by ERISA, 29 U.S.C. § 1002(5)..

**Factual Allegations**

9.     LifeLock is in the business of fraud prevention and identity theft protection services and operates nationwide. LifeLock is actively engaged in interstate commerce based on the services that they provide to consumers.

10.     The services provided by  to and/or on behalf of DEFENDANTS also qualify as interstate commerce.

11.     Richardson contacted LifeLock after she heard an interview with Davis on CNN in June 2006.  Richardson had already established herself as a consumer advocate, having been a victim of identity theft herself.  She was interested in the product and requested additional information.

12.     Mike Prusinski ("Prusinski") a LifeLock executive whose titles in the relevant timeframe included Senior Vice President Corporate Communications and Senior

Vice President & Founding Partner, personally responded to her email and asked her if she wanted to speak directly with Davis.   Later that same week, Richardson and Davis spoke by phone and discussed what prompted each of them to work in the fraud protection industry.

13.   Richardson spoke with Davis about her personal experiences and her upcoming book and Davis shared with Richardson that his interest came from a time when his co-founding partner, Robert Maynard ("Maynard"), ended up in jail for a crime he did not commit because his identity had been stolen.

14.   Davis offered Richardson a free membership, which she declined.   She candidly told him she was skeptical of his service.   Richardson asked Davis pointed questions about what LifeLock had to offer that credit monitoring services did not.   Davis assured Richardson that his company was for real and that LifeLock would be the company that would restore Richardson's faith in corporations.   During this call, Davis first advised Richardson that he lived by the code:  "Always do what's right – not what you can."

15.   In late 2006 Richardson suffered another instance of credit card fraud.   She reconnected with Prusinski and relayed her story and frustration over having to make all the calls and write all the letters to rectify the problem.   Prusinski told Richardson that if she had been a LifeLock member, LifeLock employees would be doing the work.

16.   Richardson flew to Phoenix to visit her daughter and, while in town, had a meeting with Davis, Prusinski and Maynard at the LifeLock offices.   They discussed ways in which they could support each other's efforts.   At that meeting, the LifeLock executives

asked Richardson for a "wish list" of ways in which LifeLock could help Richardson and they, in turn, advised her that they would help promote her efforts.

17.    Richardson began working with LifeLock in June 2006 under a general oral employment agreement.

18.    In 2007, Richardson continued working with LifeLock and was paid $6,000.00 for her services which included mostly blogging efforts, media interviews, marketing and business development.  See Exhibit "A". Toward the end of 2007, Richardson approached executive Prusinski seeking a full time position. LifeLock hired Richardson soon after.

19.    The catalyst for the first formal agreement between Richardson and LifeLock for 2007 was Richardson's request for a steady paycheck.  When Richardson advised Prusinski that she could no longer afford to work for nothing, Prusinski told Richardson that he wanted to "lock [her] down."

20.    Richardson became an "employee" of LifeLock on or about January 1, 2008, when she entered into a one page employment agreement with LifeLock for a one year term.  Pursuant to the agreement, she was paid $3,000 per month for the one year term.  See Exhibit "B".

21.    Richardson interacted regularly with select executives at LifeLock.  Those executives included Prusinski, Tami Nealy ("Nealy") who served as Senior Director - Corporate Communications, and Davis.

22.    In June 2007, Maynard resigned from the company after a Phoenix New Times article exposed the fact that his personal "identity theft" story was completely false.

Prior to his resignation, his story caused significant negative press for LifeLock. Richardson emailed Prusinski on June 2, 2007, expressing concern about the situation and questioned whether her loyalty to LifeLock was warranted.  Prusinski assured her that she could trust them, things were not as the media was reporting them, and that Richardson should stick by LifeLock.

23.    Richardson believed Prusinski's and Davis's representations that they could be trusted and continued her work as a LifeLock spokesperson.  She flew Phoenix in late 2007 to attend media training at LifeLock and in early 2008 received LifeLock business cards that identified her job as "Business Development."  Richardson provided continuous services during her multi-year employment history with LifeLock in the areas of media relations, consumer education, victim education, public image development, speaking engagements, blog development, creative ideas that they applied to their offerings, advocacy development, event planning, educational events, marketing, consumer insight and other services under LifeLock's direction.

24.    In early 2008, LifeLock, through its employees, Prusinski, Nealy, and Davis, began to make promises and representations to Richardson regarding her status at LifeLock, her future with LifeLock, her entitlement to future benefits and other representations related to LifeLock's trustworthiness and the trust which Richardson should have in LifeLock based on their long term relationship and on LifeLock's "do what's right" motto.

25.    In February 2008, LifeLock launched a "Strike Back Tour" to educate consumers about identity theft.  The tour began in Miami and Richardson had agreed to let

LifeLock ship the collateral to her home for the tour.  Prusinski and Davis came to Richardson's home to collect the materials for the tour.  In Richardson's kitchen, Davis told Richardson and her spouse that " I can promise you this, I will always do what I should, not what I can."

26.    Between 2008 and 2010, LifeLock was involved in regulatory and litigation matters across the country for fraud and deceptive practices.  At least 14 state class actions had been filed against LifeLock.

27.    One of those lawsuits involved a case filed in early 2008 by Experian against LifeLock.  Experian filed the case in the federal district court for the Central District of California alleging that LifeLock was engaging in deceptive and fraudulent behavior.

28.    As part of that lawsuit, Experian subpoenaed Richardson's files in the summer of 2009.  When Richardson advised LifeLock about the subpoena, LifeLock retained Holland & Knight in Miami to represent her and file an objection.  Holland & Knight filed the objection in August 2009.

29.    Despite not having standing to object to the subpoena to Richardson LifeLock also filed an objection to the subpoena.

30.    On August 25, 2009, attorneys at Holland & Knight advised Richardson that one of LifeLock's vice presidents testified at his deposition that Richardson was a LifeLock spokesperson.  Richardson learned that that testimony would mean she would likely have to respond to some of the items addressed by the subpoena.

31.     Nothing ultimately came of the subpoena because the LifeLock/Experian litigation settled in October or November of 2009.

32.     The 2008 agreement was the first written agreement as opposed to the 2006 and 2007 years which included all oral/email terms. The 2008 and 2009 agreements were simple one page agreements with minimal terms and made no express mention of Richardson being considered an independent contractor.  The 2008 and 2009 agreements contained exclusivity clauses.  Richardson's compensation in for 2009 was $4,500 per month. See Exhibits "B" and "E".

33.     Richardson's agreement continued into 2009.  At the time she and Prusinski discussed the extension, Richardson raised the issue of benefits with Prusinski and noted that she seemed to be the only person not receiving full benefits and stock options.

34.     Prusinski assured Richardson that once the legal and regulatory matters died down; she would get what she deserved.

35.     Nealy, Prusinski and Richardson had multiple email exchanges and phone calls in November and December 2009 to discuss the extension of her agreement into 2010.

36.     Richardson tried to get the 2010 contract wrapped up before the end of 2009 so that no payments would be delayed.  Nealy provided her with a contract that was markedly different than any contract she had previously signed.  The contract was over eight pages long.  No one at LifeLock warned Richardson that the terms of her agreement would change so drastically.

37.     Richardson was shocked at the content of the contract and shared her concerns with Nealy on January 4, 2010 that she was:

> Very disappointed -on so many levels. To have a contract this size, come at the last minute, with no time for an attorney to review, no knowledge that I would need one to do so, no salary step, no support or consideration for my efforts to form a non-profit, yet it's really a one sided legal document that LifeLock can terminate at any time chose for any reason.
>
> This is what I would expect of a big corporation that I had no loyalty to -or from - but not from the company that I have gone to war for and stood by throughout the years, always available and on it -no matter what. Hit jobs, so-called rogue attorneys, Experian, hackers, lawsuits, advocates, and more --I feel I have proven my worth, my loyalty and my ability to make a difference and bring in opportunities for LifeLock.

38.     Nealy assured Richardson in several emails in December 2009 and January 2010 that the contract was just a formality that was mandated by "Legal" and that LifeLock would "NEVER do anything to adversely affect our relationship with you." Nealy commiserated with Richardson and told her that she was "sure you are as sick of these disruptive and distractive legalisms as I am.  I hope we can work through this soon."

39.     In a December 21, 2010 email from Nealy to Richardson, Nealy indicated she was working with the Legal Team to push the extension through, told her to enjoy her holidays, and that "we are here to do what is right - ALWAYS!!" See Exhibit "H"

40.     At the same time Prusinski also advised Richardson that it was important to finish up the contract, put it behind them, and not make so much of it.

41.     During this time-frame, Nealy, Prusinski and Davis had multiple conversations assuring Richardson that the new contract was nothing to worry about. Richardson was told to "trust them" and repeatedly reminded that LifeLock "Does what they should, not what they can."

42.    In the 2010 contract, LifeLock also inserted an exclusivity provision and an unenforceable non-compete provision, prohibiting Richardson from working with a competitor for one year.

43.    Richardson felt as though Prusinski was pressuring her to get over it and sign the contract.  When he told her that LifeLock would understand if she wanted to go elsewhere, Richardson interpreted that as meaning that she would be without an income if she did not sign.

44.    Richardson's conversation with Prusinski told her:  "Todd and I thought by now you would trust us, we've never given you reason to doubt us and you above all people should know we recognize how much you've sacrificed and we don't forget people like that. We value them. You know Todd lives by doing what should be done not what can be done. Do you believe that? Yes. Then trust us, we have to maneuver lawsuits and recover from these high legal fees and we are looking out for you as we do ourselves."

45.    Prusinski also advised Richardson that she was "a large part of [LifeLock's] success, do you really think we aren't going to remember that or make things right with you when we get through this?"  This comment came up in the context of discussing benefits and stock options.

46.    Richardson was advised by Prusinski when the topic of her compensation and benefits arose that she needed to be patient and help them get through their legal and regulatory problems that were creating massive legal bills. Prusinski told her to "Hold on, you've already been through the worst, we're going places and we're taking you with us. You'll get that nonprofit, just keep doing what you've been doing. We will come through

the fire and be stronger for it.  Tell Michael we are family and we will have your back as you've had ours. We will all have financial security and look back at what we've sacrificed and realize it was all worth it.

47.    Prusinski and Richardson had similar conversations frequently, particularly during contract discussion times and times during the years when Richardson was working long hours, evenings, and weekends and when she questioned why employees who come in off the street get more than she was getting.

48.    Prusinski had advised Richardson to ask Davis for stock in January 2010. Todd responded by indicating that was not possible. When Richardson told Prusinski that Davis rejected her request for stock, Prusinski told Richardson that LifeLock often used stock options to pay vendors.

49.    On January 4, 2010, Richardson and Nealy exchanged emails regarding the status of her contract.  Richardson received her contract later that day.  Nealy advised Richardson that it "looks differently than years passed (sic) because all contracts are done by our Legal Team."  Richardson's concerns about the contract were again allayed when Nealy advised her to "rest assured" the contract was reworked to address Richardson's concerns.

50.    Richardson was repeatedly told by Prusinski, Davis, and Nealy that she was "family," and "one of them."  Nealy reiterated that comment in a January 25, 2010 email that "I need you to know that when you need a "break" to focus on family that your LifeLock family is here to support you."

51.     Again, in late 2011, Richardson and LifeLock entered into negotiations to continue her services to the Company.

52.     As the 2011 contract year approached, Prusinski assured Richardson in a December 3, 2010 that she would remain with LifeLock:

> Let me stop the worrying now, of course you will stay part of the family. You are a valuable member of what we do and who we are, and I couldn't imagine going through another year without you. :)

> Now we have some work to do this year besides having you do some low-level speaking engagements or interviews. It's time for us to build something that can help many consumers and victims. Of course I'm talking about the consumer and victim networks. Our law enforcement network is more that (sic) 3,000 strong and now it's time to build out the other. That's where u come in.

> I'll leave it to Tami to build out the new contract and talk more details, but we must have a network (or start of one) in place by this time next year.

> As always, thank you for the wonderful support and friendship. You are a great comfort to us and one piece of this puzzle that never falters.

53.     In Richardson's 2011 contract, she was tasked with developing a "Consumer Advocate Network." This task was, in Richardson's mind, the culmination of her work with LifeLock. Richardson was charged with creating what would be non-profit group that she would head.    See Exhibit "I".

54.     LifeLock again purposely gained unfair advantage by knowingly presenting the Agreement late in order to induce Richardson to sign it without offering any valid explanation for lateness or for the terms unilaterally set by LifeLock, or the intent of the new multi-page contract that was used in 2010 or 2011.

55.     On February 23, 2011, Richardson met with Prusinski and Nealy at the Hollywood, Florida Marriott. Prior to the meeting, Prusinski told Richardson that this was the year she could focus on consumer protection and the Consumer Advocate Network

was a go. Prusinski advised Richardson that this initiative was going to be LifeLock's biggest budget item in 2012.

56.    As late as November 2011, Richardson was given the green light by Prusinski and Nealy to continue budgeting and planning for the effort.

57.    Then, on December 8, 2011, Richardson learned that LifeLock was not going to fund the non-profit.  In addition, her compensation was decreased.

58.    Richardson and LifeLock intended to continue their relationship anyway.  In February 2012; however, Richardson did not have an executed contract.    As the negotiations were ongoing with Nealy, Richardson made it clear that she was again disappointed in the fact that she was still not being offered stock options.

59.    Nealy offered to have the new contract run for 18 months at annual compensation of $66,000.

60.    When Richardson was in the process of finalizing her 2012 contract Prusinski told her that she should ask for 1,000 shares of LifeLock stock.  Prusinski noted that "if anyone should reap the rewards of their hard work, it's you." When they go public, they will be celebrating LL's successes, you should be too."

61.    Richardson relied on each and every promise, representation and explanation from LifeLock and its executives when she agreed to accept the salary, work, travel, direction, control and exclusivity requirements as well as contracts presented yearly by LifeLock.

62.    The representations and promises made by LifeLock's executives Prusinski, Davis, and Nealy, as described above,  include, but are not limited to the following:

a.  LifeLock promised that once it was in a better financial position, Richardson would begin receiving benefits that other employees received, including stock options, health care and retirement accounts;

b.  LifeLock promised that if Richardson stayed with LifeLock through their "tough times" with regulatory problems and lawsuits that she would be rewarded in the future with better compensation packages;

c.  LifeLock represented to Richardson on many occasions that she was a valued employee of LifeLock and that she was getting in on the ground floor with LifeLock and would be with them for the long run;

d.  LifeLock represented to Richardson that it was a company founded on the ideal of "doing the right thing" by their members and employees including Richardson;

e.  LifeLock consistently promised Richardson that LifeLock was a trustworthy business that was misunderstood, made mistakes, besieged by competitors but they would always do what was right and what was necessary to land on top, and that she should have trust and faith in them;

f.  When Richardson received a renewal contract for the calendar year of 2010 during the holidays in late 2009, suddenly the normal one page Agreement was a multi-page contract and when she questioned or objected to terms in the contract, and the lateness of delivery not allowing her time to have a lawyer review, LifeLock responded, "[we] would hope that after so much time with LifeLock you would believe in us and understand that this

contract is simply what is required by our Legal Team and that we would NEVER do anything to adversely affect our relationship with you". LifeLock through Director of Public Affairs, Tami Nealy, stated, "Your 2010 contract is with Legal. They are finalizing with their technical terms – not any issues that you or I need to be concerned with." <u>See</u> Exhibits "C" and "D".

g. A similar situation occurred just prior to the 2011 renewal in which Richardson was asked to trust LifeLock as they continued to insert unilateral provisions in its contracts to the detriment of its employees, including Richardson.

63.    The promises made by LifeLock were made with the intention of building Richardson's trust and confidence in the company to induce her into signing the contract so that she would continue to work for the company without being afforded protections and benefits that she was entitled to until such time the company was able to recover from their recent legal woes and with the intention of creating exclusivity with Richardson such that she was unable to seek out other opportunities or sources of revenue or employ in her chosen field.

64.    LifeLock took knowing deceptive actions that actually made Richardson believe that it was LifeLock's decision to make with regard to her entitlement to employee benefits and protections from overtime work without compensation.

65.    In 2010, following the passing of several new laws and reclassification initiatives aimed at preventing companies from misclassifying employees as independent

contractors, LifeLock began to provide much more detail in its agreements, including, but not limited to, express waivers of benefits, and other unilateral and one-sided provisions which significantly favored LifeLock to the detriment of its employees, including Richardson.  See Exhibits "F" and "G"[1].

66.    Throughout her term of employment with LifeLock, Richardson was consistently lured into a state of trust based on representations from many top executives at LifeLock, including Davis, Nealy, and Prusinski.

67.    Richardson was promised the opportunity to grow with the company and that she would be entitled to benefits, bonuses and rewards for her dedication as soon as LifeLock escaped its multiple battles on the legal front and became better situated financially and she relied on these representations and their repetitive claims and Davis' personal and corporate motto proclaiming, "[we] always do what's right."

68.    Each of her employment agreements from 2008 through 2012 contained exclusivity clauses which provided that she could not accept other employment opportunities or accept advertising revenue from potential competitors of LifeLock.

69.    Throughout her employment with LifeLock, Richardson was contractually unable to seek or accept work offers or advertising revenue on her blog site, givemebackmycredit.com, from potential competitors of LifeLock, which cutoff all other sources of revenue.  This left her without an opportunity to create outside revenue as a

---

[1] Exhibit "F" is an email from Tami Nealy for LifeLock attaching a draft of the 2010 contract and explaining the reason for the expanded terms as being due to their legal team's involvement.  Exhibit "G" is an email from Tami Nealy for LifeLock to Richardson attaching the fully executed 2010 contract.

blogger, as any true independent contractor would be allowed, according to all state and federal legal definitions, making her further dependent on LifeLock.

70.    LifeLock was aware that Richardson's sole source of income came from them and that by the time the contracts were sent to her each year, she was in need of her next paycheck for meeting  personal obligations and daily expenses such that she was essentially forced to sign the contracts without understanding the terms or protecting her rights and instead relying on LifeLock's executive's promises and representations indicating it was not necessary to worry because after all this time she should know them and trust them since they claimed to always "do what's right."

71.    Throughout her employment with LifeLock, Richardson was misclassified as an "independent contractor," per the terms of her contracts, but was always treated as an employee, felt like an employee, and was often referred to as "a LifeLock family member,"  "LifeLock representative," "LifeLock Advocate," "LifeLock Team Member," "LifeLock Education Specialist," as they often changed her title depending on their needs.

72.    The following facts and circumstances establish that Richardson was an employee as opposed to an independent contractor of LifeLock and that LifeLock was aware of Richardson's status as an employee:

      a.  Richardson was economically dependent upon LifeLock;

      b.  LifeLock required an exclusivity clause and knew that they were her sole source of income during her employment period;

      c.  LifeLock exercised substantial control over the tasks performed by Richardson;

d.  Richardson's tasks were integral to LifeLock's business;

e.  LifeLock trained and directed Richardson throughout her employment; <u>See</u> Exhibit "J"[2].

f.  LifeLock controlled Richardson's daily schedule, daily tasks and provided her "talking points" for her tasks;

g.  LifeLock provided power point presentations for Richardson to present on speaking engagements;

h.  LifeLock required Richardson to attend mandatory training sessions;

i.  LifeLock paid for Richardson's travel and travel expenses for business related trips; See Exhibit "K"[3].

j.  LifeLock directed Richardson to attend and participate in telephone conferences, media interviews and many speaking engagements on behalf of LifeLock on a regular basis;

k.  LifeLock provided Richardson business cards on two separate occasions which stated, "Denise Richardson, Business Development" and "Denise Richardson, Education Specialist" and each contained the LifeLock logo;

l.  Richardson was provided LifeLock marketing materials, business cards, pens, flyers, shirts, Power Point Presentations, training, access to confidential membership info, and other LifeLock related marketing materials including, logo for daily use;

---

[2] Exhibit "J" is a sample of training materials received by Richardson during her employment with LifeLock but is not meant to be an all-inclusive representation of the training materials received by Richardson as she was asked to attend training sessions and was provided training materials on multiple occasions.

m. Richardson was provided LifeLock's corporate policies and was expected to abide by same;

n. Richardson was provided "team member" lists by LifeLock and was included on these lists;

o. LifeLock made requests for Richardson to make immediate phone calls, notices for written follow up requests, requests for articles, interviews, appearances and blogs;

p. LifeLock directed Richardson where, when and how to blog, respond or comment on various news articles and blogs concerning identity theft and issues directly associated with LifeLock's business, lawsuits, and regulatory problems;

q. LifeLock supplied Richardson with various materials to perform her services including, but not limited to, purchasing her a network server using a LifeLock corporate credit card;

r. LifeLock regularly relied on Richardson to be available on a moment's notice as evidenced by the multiple and continuous tasks provided to her by a number of executives and team member employees of LifeLock;

s. Richardson was specifically precluded from working with any potential competitors of LifeLock, essentially limiting her to a single employer in her chosen field and required that Richardson not accept advertising revenue on her blog at givemebackmycredit.com, other than LifeLock banner ads;

---

[3] Exhibit "K" is not meant to imply that Richardson's travel for LifeLock was limited to this single email which relates to

t.   LifeLock chose an attorney and paid for all legal fees for legal services rendered on behalf of Richardson when she was subpoenaed in litigation involving LifeLock.

u.   Richardson was directed, manipulated and presented in the media and the public eye as being part of the LifeLock organization in the same manner as any employee;

v.   Richardson performed typical employee tasks such as conducting identity theft related media interviews, business development, promoting fraud prevention and education initiatives on behalf of and under the direction of LifeLock;

w.   LifeLock expected Richardson to adhere to the same LifeLock employment and corporate policies as any other LifeLock employee;

x.   LifeLock determined Richardson's Compensation which was deposited monthly in her personal account;

y.   Richardson and LifeLock had a lengthy recurring working relationship that both parties had reason to believe would continue;

z.   LifeLock paid Richardson as a salaried employee on a monthly rate as opposed to on a "per-task basis".

73.   LifeLock's misclassification of Richardson as an independent contractor has greatly benefitted LifeLock to Richardson's financial and professional detriment.

---

LifeLock's travel policy. She traveled and was reimbursed for her travel on a regular basis during her employment.

74.    The intentional misclassification of Richardson's employee status by LifeLock allowed LifeLock to avoid tax obligations, avoid offering Richardson access to multiple retirement plans, health care plans, stock options, paid sick leave, paid vacation time, unemployment insurance, worker's compensation insurance and paid overtime as required by Federal labor laws.

75.    Richardson was unable to seek certain other employment opportunities and passed on others based on her exclusivity agreements with LifeLock.  Richardson actually rejected a number of opportunities to build relationships with similarly situated companies and advertising offers because of conflicts with LifeLock's products and services.

76.    LifeLock's misclassification of Richardson as an independent contractor as opposed to an employee was known and deliberate in furtherance of LifeLock's attempt to avoid tax obligations, legal obligations, offering benefits and to create an unfair competitive advantage for itself in the industry of fraud prevention and identity theft protection which placed a burden on interstate commerce and on its competitors.  See Exhibit "L"[4].

77.    Richardson was forced to enter into and sign employment contracts which referred to her as an independent contractor despite the fact that she was in fact an employee.

78.    Richardson was told that if she failed to sign employment contracts, she would not be permitted to work for LifeLock.

---

[4] Exhibit "L" is a written example of LifeLock's knowledge that it had misclassified Richardson and its knowledge of the federal guidelines for classification of employees. This was not a limited occurrence and this exhibit is attached as a sample to show LifeLock's intent and state of mind.  LifeLock's statement in this email through Tami Nealy, Senior Director,

79.    Richardson was informed that if she failed to agree to the exclusivity clauses, waiver of benefits and other biased clauses in her employment agreements she would not be permitted to work for LifeLock or be paid.

80.    Further, Richardson consistently worked greater than forty (40) hour work weeks under the direction and at the request of her superiors at LifeLock, including Davis, Nealy, and Prusinski, and received no additional compensation for her overtime labor, being told that one day her loyalty and hard work would be rewarded and that "LifeLock is going places and we're taking you with us".

81.    Defendant, LifeLock has maintained and continues to maintain numerous ERISA retirement and welfare benefit plans throughout the years which are available to persons who are "employees" of LifeLock subject to certain qualifying criteria unique to each plan.

82.    Under information and belief, Richardson qualified for LifeLock's 2006 Incentive Compensation Plan during her multi-year employment with LifeLock but was denied the opportunity to participate in the plans based on her misclassification and LifeLock's intentional actions taken to prevent her access.  See Exhibit R.

83.    The various plan materials and information were never provided to Richardson by LifeLock based on her misclassification and misrepresentations by LifeLock that Richardson was not entitled to participate.

84.    Richardson was repeatedly refused benefits during her term of employment with LifeLock and was denied access to the 2006 Incentive Compensation Plan.

Corporate Communications, is self-serving and false in that LifeLock actually directed and controlled how Richardson would

85.    The 2006 Incentive Compensation Plan is open to employees classified as contractors:

> 1. ***Purpose***. The purpose of this AMENDED AND RESTATED 2006 INCENTIVE COMPENSATION PLAN (the "Plan") is to assist LifeLock, Inc., a Delaware corporation (the "Company") and its Related Entities (as hereinafter defined) in attracting, motivating, retaining and rewarding high-quality executives and other employees, officers, directors, consultants and other persons who provide services to the Company or its Related Entities by enabling such persons to acquire or increase a proprietary interest in the Company in order to strengthen the mutuality of interests between such persons and the Company's stockholders, and providing such persons with performance incentives to expend their maximum efforts in the creation of stockholder value.

86.    Richardson has not been able to exhaust all administrative remedies since none are available to her at this time since she has been terminated. Richardson was never provided the plan materials despite her requests and therefore there were never administrative remedies available for her to exhaust.  Attempting to exhaust any and all administrative remedies would be futile under the circumstances.

87.    Between January 10, 2012, and February 1, 2012, LifeLock informed Richardson and Richardson relied on its representations, that her yearly employment contract would be renewed for an eighteen month term of January 1, 2012 through June 30, 2013.

88.    LifeLock presented Richardson with a contract to sign in which she would be paid an increased salary of $6,000 per month for an increased eighteen month term. This was a departure from the typical twelve month contracts that had been used in the past as insisted on by Richardson and agreed by LifeLock in order to avoid her being in the position she had been placed in by LifeLock during the holiday seasons again.

---

respond to the public and media throughout her employment with LifeLock.

Richardson received her first direct deposit of the 2012 year from LifeLock in early January.  See Exhibits "M", "N" and "O".

89.    LifeLock admitted to Richardson that it was its delay in getting the contract together earlier and promised this would now be a top priority and there was no need to worry as they always do things right and senior management had promised they would do everything necessary to complete the additional details of the agreement and make things right.

90.    Richardson executed the contract on or about February 15, 2012.  The approximate one month delay was due to LifeLock defining and revising her contractual tasks which were finalized on February 14, 2012.  See Exhibit "P".

91.    Thereafter, LifeLock directed Richardson to perform certain tasks and Richardson proceeded with her typical work schedule and routine.  She performed all tasks ordered and directed by her employers and her employers accepted and benefited from the work product generated by Richardson.

92.    During the negotiations for her 2012 contract, Richardson began to question LifeLock executives about employee benefits for 2012 and beyond that she felt she was entitled to based on their many promises and based on her knowledge that other employees were entitled to welfare and benefit plans and stock options offered by LifeLock.  Richardson inquired if her benefit package could now be included in the 2012 contract.

93.    DEFENDANTS then changed their position and terminated Richardson in late February 2012 after unilaterally inserting a termination provision in her previously

executed contract which Richardson signed based on LifeLock's representation to her that she would only be paid if she signed immediately.  See Exhibit "Q"[5].

94.    Richardson has been caused significant distress and losses financially, emotionally, professionally, and physically by the longstanding knowing and intentional actions of LifeLock.  Richardson's entire career has been set back many years by LifeLock's deceptive acts and outrageous conduct toward her.  She is emotionally distraught and has suffered and continues to suffer immensely based on her history with LifeLock.

95.    She has had to retain the undersigned attorneys to represent her interests in this action and has agreed to pay for their reasonable fees and costs.

## COUNT I – Violations of ERISA Fiduciary Duties
### (LifeLock)

96.    All of the previous paragraphs are incorporated into this claim.

97.    At all pertinent times, LifeLock acted as either the statutory administrator, named fiduciary or fiduciary of LifeLock's 2006 Incentive Compensation Plan.  In these capacities, the conduct of LifeLock was governed by the strict fiduciary duties of Section 404(a) of ERISA, 29 U.S.C. § 1104(a).  These fiduciary duties include, but are not limited to, the duty to act solely in the interest of plan participants and beneficiaries, to act with utmost loyalty to them, to administer the plans in accordance with the written plan documents, to disclose truthful information about the plans and to identify and enroll all persons who are identified to participate in each plan.

---

[5] Exhibit "Q" purports to show LifeLock's unilateral insertion of the termination provision into the previously signed contract.  Richardson was terminated orally several days later by DEFENDANTS based on the termination provision which they unilaterally inserted.

98.    LifeLock violated its strict ERISA fiduciary duties on a continuing basis by, among other things:

a.    Failing to review the facts applicable to the entitlement of Richardson under the pension and employee welfare benefit plans and to correct or prevent the exclusion of Richardson from the plans;

b.    Failing to distribute to Richardson documents relating to the pension and employee welfare benefit plans which Richardson was entitled to receive under ERISA and by otherwise misleading, and concealing from Richardson facts showing Richardson was entitled to participate;

c.    Making misrepresentations to Richardson who was classified as an independent contractor that she was not entitled to participate in the pension and employee welfare benefit plans when in fact she was entitled to participate.

99.    LifeLock's intentional and wrongful conduct harmed Richardson and therefore LifeLock committed a continuing violation of ERISA §404(a), 29 U.S.C. § 1104(a).

100.    Richardson seeks all equitable relief available to her pursuant to ERISA, 29 U.S.C. 1132(a)(3).

101.    Richardson seeks to recover attorneys' fees and costs pursuant to ERISA, 29 U.S.C. §1132(g).

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for equitable relief stemming from the breaches of fiduciary duties, pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation,

and for any further relief deemed just and proper.

## COUNT II – Unlawful Interference With Attainment of ERISA Benefits
### (LifeLock)

102.    All of the previous paragraphs are incorporated into this claim.

103.    Under the terms of LifeLock's 2006 Incentive Compensation Plan, Richardson was entitled to be a participant.

104.    Richardson is within the class of protected persons as defined by ERISA since she is a "participant."

105.    By reason of the intentional and wrongful conduct, LifeLock on a continuing basis took specific actions to discriminate against Richardson for the purpose of interfering with her right to attain and participate in and receive benefits under the respective plans.

106.    LifeLock acted with specific intent to interfere with Richardson's right to plan participation and benefits.

107.    LifeLock thereby committed a continuing violation of ERISA 29 U.S.C. § 1140 and is liable for all losses that this continuing violation caused to Richardson.

108.    Richardson is seeking attorneys' fees and costs pursuant to ERISA 29 U.S.C. §1132(g).

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock, Inc.'s ERISA violations, plus pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

## COUNT III – ERISA Retaliation Claim
### (LifeLock)

109.    All of the previous allegations are incorporated into this claim.

110.    Under the terms of LifeLock's 2006 Incentive Compensation Plan, Richardson was entitled to be a participant.

111.    Richardson is within the class of protected persons as defined by ERISA since she is a "participant."

112.    Richardson's questioning of LifeLock regarding her entitlement to benefits is a protected act under ERISA.

113.    LifeLock was aware at all times that Richardson's act of questioning LifeLock regarding her entitlement to benefits as an employee is a protected act under ERISA.

114.    LifeLock took adverse employment actions against Richardson by firing her and terminating her executed employment agreement following her request for benefits.

115.    LifeLock took these adverse employment actions in retaliation for Richardson exercising her rights as an employee as defined by LifeLock's ERISA plans.

116.    LifeLock thereby violated ERISA 29 U.S.C. § 1140 and is liable for all losses caused to Richardson.

117.    Richardson is seeking to recover attorneys' fees pursuant to ERISA 29 U.S.C. §1132(g).

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock,

Inc.'s ERISA violations, plus pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

### COUNT IV – Unlawful Misclassification and denial of ERISA Benefits (LifeLock)

118.     All of the previous allegations are incorporated into this claim.

119.     Under the terms of LifeLock's 2006 Incentive Compensation Plan, Richardson was entitled to be a participant.

120.     Richardson is within the class of protected persons as defined by ERISA since she should have been provided benefits under this plan as a "participant."

121.     By reason of the intentional and wrongful conduct, LifeLock on a continuing basis took specific actions to discriminate against Richardson for the purpose of interfering with her right to attain and participate in and receive benefits under the respective plans.

122.     LifeLock acted with specific intent to interfere with Richardson's right to plan participation and benefits.

123.     Richardson seeks relief pursuant to ERISA 29 U.S.C. § 1132(a)(1)(B), and seeks all benefits that she is and was entitled to under LifeLock's 2006 Incentive Compensation Plan.

124.     Richardson is seeking attorneys' fees and costs pursuant to ERISA 29 U.S.C. §1132(g).

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock,

Inc.'s ERISA violations, plus pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

### COUNT V – Conditional Claim For Retroactive Benefits Under ERISA Plans (LifeLock)

125.    All of the previous allegations are incorporated into this claim.

126.    This conditional count is pled pursuant to Fed.R.Civ.P. 8(e)(2). Richardson asserts and pursues this conditional count only if the Court determines that Richardson is entitled to obtain benefits under LifeLock's 2006 Incentive Compensation Plan.

127.    LifeLock's 2006 Incentive Compensation Plan is an arrangement governed by ERISA.

128.    As a result of her employment with LifeLock, Richardson was eligible to receive benefits from LifeLock's 2006 Incentive Compensation Plan.

129.    LifeLock's intentional and wrongful misclassification of Richardson as an independent contractor had the effect of denying Richardson benefits to which she was otherwise have been entitled to under plan.

130.    LifeLock uniformly but wrongfully informed Richardson that she was not eligible to receive benefits from the plan and, in doing so, LifeLock violated its duty as administrator and fiduciary of the plan.

131.    LifeLock never allowed Richardson to apply for benefits under the plan and the plan does not provide administrative procedures for challenging the denial of benefits under the plans.

132.     Any attempt by Richardson to obtain relief by recourse of administrative procedures was futile, as demonstrated by LifeLock's continuing practice of excluding Richardson from participation throughout her employment.

133.     If it is found that Richardson was entitled to recover actual benefits under these plans in which she never became a participant due to her misclassification, then pursuant to §502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Richardson is entitled to payment of all back benefits that were intentionally and wrongfully denied to her.

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock, Inc.'s ERISA violations, plus pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

## Count VI – Failure to Pay Overtime in Violation of the FLSA
### (LifeLock)

134.     All of the previous allegations are incorporated into this claim.

135.     The FLSA, 29 U.S.C. § 207(a)(2) provides in relevant part:

> "no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate of not less than one and one-half times the regular rate at which he is employee."

136.     Richardson was willfully and intentionally misclassified by LifeLock as an independent contractor rather than an employee in order for LifeLock to avoid tax obligations and to avoid paying Richardson overtime wages for workweeks in excess of forty hours, benefits and other compensation that Richardson would have been entitled to as a regular employee.

137.    By the acts and omissions complained of above, including, inter alia, by failing to pay overtime wages for work in excess of forty hours per week, LifeLock violated the FLSA.

138.    Richardson is entitled to be paid at the defined overtime rate for all hours in excess of forty hours per work week during her employment at LifeLock.

139.    LifeLock's violations of the FLSA were willful and accordingly, a three year statute of limitations applies, pursuant to 29 U.S.C. § 255.

140.    LifeLock has intentionally, willfully and repeatedly engaged in a pattern, practice or policy of violating the FLSA.

141.    Richardson has been harmed and has suffered damages by being denied overtime pay in accordance with the FLSA, plus incurred costs and attorneys' fees.

142.    As a result of LifeLock's unlawful acts and violations of the FLSA, Richardson has been damaged and pursuant to 29 U.S.C. § 216(b) is entitled to recover overtime wages, liquidated damages in an amount equal to the wages she is owed as unpaid overtime, prejudgment interest, attorneys' fees and costs.

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock, Inc.'s FLSA violations, plus pre-judgment interest and reasonable costs, liquidated damages, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

## Count VII – Breach of Employment Contract
### (LifeLock)

143.    All of the previous allegations are incorporated into this claim.

144.    LifeLock and Richardson entered into a written contract for employment on or about January 1, 2012.

145.    LifeLock and Richardson began to perform pursuant to the contract after its execution.

146.    LifeLock wrongfully terminated the contract thereby breaching the terms of the agreement in February 2012.

147.    Richardson has been damaged by the wrongful termination and by LifeLock's breach of the written employment contract.

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock, Inc.'s breach, plus pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

## Count VIII – Unjust Enrichment
### (LifeLock)

148.    All of the previous allegations are incorporated in this claim.

149.    Throughout the four plus years of Richardson's employment with LifeLock, Richardson conferred multiple benefits upon LifeLock including loyal services and employment and served as the public spokesperson for LifeLock throughout periods of negative publicity that LifeLock was facing through Richardson's term of employment.

150.     LifeLock had express knowledge of the services rendered by Richardson and knowingly and willingly accepted and retained the benefits that resulted from Richardson's work.

151.     In fact, LifeLock had requested, directed and controlled many of the actions taken by Richardson which led to the benefits enjoyed by LifeLock.

152.     LifeLock intentionally and willfully misclassified Richardson as an independent contractor throughout her term of employment.

153.     LifeLock was benefitted in multiple ways by Richardson's services and misclassification, including enjoying a preserved public image, being seen by the public in a positive light through times of adversity, avoiding tax obligations that would have been incurred had Richardson been properly classified, avoiding providing benefits such as pension plans, stock options and welfare health plans to Richardson during her employment, and other benefits that will become known through the course of discovery.

154.     The circumstances are such that it would be wholly inequitable for LifeLock to retain such benefits without paying for them.

**155.**     In the event Richardson's contractual claims are found invalid, her claim for unjust enrichment is a separate, alternate theory.

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for equitable relief, and for any further relief deemed just and proper.

### Count IX – Fraud and Punitive Damages
### (LifeLock)

156.     All of the previous allegations are incorporated in this claim.

157.     LifeLock made the following false statements concerning material facts:

    a.  LifeLock promised to Richardson on multiple occasions that once it was in a better financial position, Richardson would be rewarded;

    b.  LifeLock promised to Richardson on multiple occasions that if Richardson stayed with LifeLock through their "tough times" with regulatory problems and lawsuits that she would be rewarded in the future;

    c.  In November of 2009, after LifeLock had settled a lawsuit with Experian, LifeLock provided Richardson a renewed employment contract for the 2010 calendar year which contained additional provisions that strongly favored LifeLock and were detrimental to Richardson.  The contract was sent to Richardson during the December holidays and LifeLock informed Richardson that they could talk through any concerns, and intentionally played down their knowing intent behind the drafting of the agreement, required that Richardson sign immediately and return the contract to LifeLock if she wanted to get paid otherwise she would not be paid until sometime in January.  When Richardson questioned LifeLock as to how they expected her to find a lawyer during the holidays to review the contract

LifeLock responded to Richardson that she should know by now that she can trust LifeLock and again reminded her they "always do what's right" .

d.  In December of 2011, a similar situation occurred in which Richardson was rushed into signing a renewed employment contract on short notice during the holiday period.  LifeLock once again responded that they were sorry to rush her, but if she wanted to be paid, she needed to trust them and sign immediately and again reassuring her not to worry, "they always do what's right"

158.    LifeLock had full knowledge when it made these statements that the statements were deceptive, false and selfishly motivated with reckless disregard for Richardson's rights and LifeLock's regulatory and legal obligations.

159.    LifeLock had specific intent at the time it made its promises to not perform.

160.    LifeLock's intent when it made these false statements was to induce Richardson to continue her loyal employment to LifeLock without exercising her legal rights or seeking additional compensation.

161.    Richardson relied on LifeLock's false statements for several years without receiving any additional rewards for her loyal services until she was wrongfully terminated in February 2012.

162.    Richardson rejected or passed on multiple offers from competitors during her years with LifeLock, rejected or passed on multiple advertising opportunities on her websites during her time with LifeLock and was prevented from building up her

advertising revenue from other sources, working toward becoming financially independent, creating a secure future for herself and growing retirement accounts with another company which she was assured would be available to her if she stayed with LifeLock.

163.    Richardson is seeking punitive damages based on LifeLock's specific intent to defraud Richardson as evidenced by the steady stream of false promises made by LifeLock for the purpose of inducing detrimental reliance from Richardson to the benefit of LifeLock.

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock, Inc.'s fraud, plus pre-judgment interest and reasonable costs, attorneys' fees, punitive damages, and the costs of this litigation, and for any further relief deemed just and proper.

## COUNT XI – ERISA Retaliation Claim
### (Todd Davis)

164.    All of the previous allegations are incorporated in this claim.

165.    Under the terms of LifeLock's 2006 Incentive Compensation Plan, Richardson was entitled to be a participant.

166.    Davis had the right to independently determine whether to continue to employ Richardson or to terminate her employment.

167.    Davis had the capability and means to provide access to all ERISA employee benefit and welfare plans to employees, including Richardson.

168.    Richardson's questioning of Davis and LifeLock regarding her misclassification and her entitlement to benefits as an employee is a protected act under ERISA.

169.    Davis was aware at all times that Richardson's act of questioning him and LifeLock regarding her misclassification and her entitlement to benefits as an employee is a protected act under ERISA. Davis personally made the same promises and representations to Richardson and her fiancé in her home in Florida in early February 2008.

170.    DAVIS decided to take adverse employment actions against Richardson by firing her and terminating her executed employment agreement following her request for benefits.

171.    DAVIS took these adverse employment actions in retaliation for Richardson exercising her rights as an employee.

172.    DAVIS violated ERISA 29 U.S.C. § 1140 and is liable for all losses caused to Richardson.

173.    Richardson is seeking to recover attorneys' fees and costs pursuant to ERISA 29 U.S.C. §1132(g).

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against Todd Davis, for all damages that she has suffered resulting from Todd Davis's ERISA violations, plus pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury for all causes of action so triable in this lawsuit.

Dated this 23rd day of April 2014.

THE COUNTERS FIRM, P.C.

By: /s/ Lisa J. Counters
Lisa Counters

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2014, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and electronically transmitted to:

Charles B. Leuin
GREENBERG TRAURIG, LLP
77 W. Wacker Drive, Ste. 3100
Chicago, IL  60601

Laurent R.G. Badoux
GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Ste. 700
Phoenix, AZ  85016

By:   s/ Lisa J. Counters